# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | |
|---|---|
| David McIntosh and Carol McIntosh, Plaintiffs, | § § § § § § § § § § § § |
| v. | |
| Bank of America, N.A., | |
| Defendant. | |

CASE NO. 5:24-cv-00287

COMES NOW Plaintiffs **DAVID MCINTOSH** ("Mr. McIntosh") and **CAROL MCINTOSH** ("Mrs. McIntosh") (Mr. McIntosh and Mrs. McIntosh collectively referred to as "Plaintiffs"), individuals based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.* Plaintiffs seek redress for the unlawful and deceptive practices committed by the Defendant in connection with its inaccurate, misleading, or incomplete reporting of the Plaintiffs' debt.

2. Defendant Bank of America, N.A. ("BOA") is reporting Plaintiff's account on each Plaintiff's respective Experian and Equifax credit report as if it were discharged through bankruptcy. In addition, BOA is reporting the account with an inaccurate and incomplete payment history.

3. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4. A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

5. The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

6. In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

7. Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetuate this bankruptcy myth, creditors intentionally and routinely ignore industry standards for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

8. Creditors know that deviating from recognized credit reporting standards will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

9. This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

10. Plaintiffs re-allege and incorporate the allegations in each and every paragraph above by reference as if fully stated herein.

11. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

12. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

13. Plaintiffs allege that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over Defendants under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

14. Plaintiffs allege that the BOA debt was a secured loan for Plaintiffs' motor home in which they lived.

15. Plaintiffs allege that the BOA debt was to be paid directly from Plaintiffs to BOA, outside of the bankruptcy plan. Plaintiffs allege that despite the fact the payments were paid outside the plan, the payments were provided for in the plan. *In re Foster,* 670 F.2d 478 (5th Cir. 1982) (holding mortgage payments made by the debtors directly to the lender are considered plan payments even though made outside the plan).

16. Plaintiffs allege that the BOA account was always paid as agreed during and after their Chapter 13 bankruptcy.

17. Plaintiffs allege that their BOA debt was a secured debt with a payment horizon which extended beyond the end of the bankruptcy as described in 11 U.S.C. § 1322(b)(5).

18. Plaintiffs alleges that the BOA debt was exempt from discharge pursuant to 11 U.S.C. §§ 1328(a)(1) and 1322(b)(5).

19. Plaintiffs allege that the BOA account is open and payments are still being made.

20. Plaintiffs allege it is patently incorrect and misleading for a debt which was exempt from discharge to be reported on a credit report in a manner that appears it was discharged.

21. Plaintiffs allege that it is patently incorrect and misleading for a debt which was not discharged in bankruptcy to be reported in a manner that appears as if it were discharged in bankruptcy.

22. Plaintiffs allege that Defendant is familiar with the FCRA requirements and credit reporting industry standards and subscribes thereto.

23. Plaintiffs allege that the FCRA requires complete and accurate reporting; therefore, a credit bureau cannot pick and choose which portions of the account to report. If an account is reported, then it should report all portions of that account in a manner which complies with the maximum accuracy and completeness standard of the FCRA.

24. Plaintiffs allege that Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

25. Plaintiffs allege that all of Defendant's actions alleged herein were committed knowingly, intentionally, and in reckless disregard for the FCRA requirements and/or credit reporting industry standards to purposefully undermine the Plaintiffs' ability to repair their individual Credit Scores.

26. In the alternative, Plaintiffs allege that Defendant's actions were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

# FACTUAL BACKGROUND

27. Plaintiffs re-allege and incorporate the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     FICO, Inc.**

28. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

29. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.[1]

30. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

31. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

32. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

33. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

34. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

35. The three largest CRAs are Experian Information Solutions, Inc.; Equifax Information Services, LLC; and TransUnion, LLC.

36. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See https://www.myfico.com* (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

37. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

38. Each of the five (5) factors is weighted differently by FICO.

39. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

40. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

41. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

42. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

43. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

44. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and FICO uses the filing date, under both Chapters, to determine how long ago the bankruptcy took place.

45. A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and

employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

46. Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.     e-OSCAR**

47. e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

48. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

49. The ACDV contains within it codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 to a Charge Account).

50. When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

51. When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

52. For clarification, an AUD, or other regular transmission, is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**C.     Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

53. When a consumer files bankruptcy, certain credit reporting industry standards exist.

54. Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

55. The Consumer Information Indicator ("CII") is a critical field in the format that indicates a special condition that applies to a specific consumer.

56. The CII must be reported on only the consumer to whom the information applies.

57. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

58. CII Code "D" indicates that a Chapter 13 petition has been filed and is active, but no discharge has been entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a tradeline. Such reporting alerts any potential lender that the account is no longer in a collectable status and is being handled by a Chapter 13 trustee.

59. CII Code "H" indicates that a Chapter 13 bankruptcy has been discharged/completed. This is usually translated on a consumer credit report as "INCLUDED_IN_CHAPTER_13" and "Discharged through Bankruptcy Chapter 13/Never late". Such reporting alerts any potential lender that the account was subject to a Chapter 13 bankruptcy and was discharged.

60. The CII Code "Q" removes previously reported Bankruptcy Indicator (A through P and Z) or personal Receivership Indicator. This code is used when the bankruptcy case is complete, but the debt was not discharged in the bankruptcy. The Account was not discharged in the bankruptcy pursuant to 11 U.S.C. §1328(a)(1) and 11 U.S.C. § 1322(b)(5).

61. The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

62. The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

63. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

64. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

65. The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

**D.     Plaintiffs' Bankruptcy Plan was Maintaining Payments; therefore, the BOA Account was Excepted from Discharge Pursuant to 11 U.S.C. § 1322(b)(5) and 11 U.S.C. § 1328(a)(1)**

66.     Plaintiffs filed a voluntary petition for Chapter 13 bankruptcy on January 18, 2019, in order to repair their individual creditworthiness and Credit Scores.

67.     The Plan provides for maintenance of payments; and was Confirmed on April 26, 2019.

68.     Under the terms of the Plan, the Plaintiffs paid their ongoing monthly mortgage payments directly to BOA.

69.     Plaintiffs' bankruptcy case was completed on March 9, 2022.

**E.     Plaintiffs' Credit Reports Contain Inaccurate Adverse Tradelines, which Plaintiffs Disputed to no Avail**

70.     On February 8, 2023, Plaintiffs ordered an Experian credit report and an Equifax credit report to ensure proper reporting by Plaintiffs' creditors (the "February 8 Credit Reports").

71.     Plaintiffs noticed adverse tradelines in their February 8 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with the FCRA or credit reporting industry standards.

72.     Plaintiffs then each disputed the inaccurate tradelines regarding the BOA account via certified mail to Experian (the "Experian Disputes Letters") and Equifax (the "Equifax Dispute Letters") on or about March 16, 2023.

73.     Plaintiffs' Experian Dispute Letters specifically put BOA on notice that the account was not discharged in bankruptcy, that the bankruptcy notations should be removed, it should reflect the current outstanding balance, and a full payment history.

74.     Plaintiffs' Equifax Dispute Letters specifically put BOA on notice that the account was not discharged in bankruptcy, that the bankruptcy notations should be removed, it should reflect the current outstanding balance, and a full payment history.

75.     Plaintiffs' Experian Dispute Letters and Equifax Dispute Letters (collectively, the "Dispute Letters") also detailed what was perceived to be problematic about the BOA account reporting, addressing the tradelines individually.

76.     Plaintiffs requested that any derogatory reporting be updated to ensure accuracy and completeness of the account(s) as required by the FCRA.

77. Plaintiffs are informed and believe that Experian received both of Plaintiffs' Dispute Letters and, in response, sent Plaintiffs' disputes to BOA, as the data furnisher, via an ACDV through e-OSCAR.

78. Plaintiffs are informed and believe that Equifax received both of Plaintiffs' Dispute Letters and, in response, sent Plaintiffs' disputes to BOA, as the data furnisher, via an ACDV through e-OSCAR.

79. On November 6, 2023, Plaintiffs, ordered additional Experian credit reports and Equifax credit reports to determine if the inaccurate reporting has updated.

80. Plaintiffs then each disputed the inaccurate tradelines regarding the BOA account to Experian (the "Second Experian Dispute Letters") on or about December 13, 2023.

81. Plaintiffs' Second Experian Dispute Letters specifically put BOA on notice that the account was not discharged in bankruptcy, that the bankruptcy notations should be removed, it should reflect the current outstanding balance, and a full payment history.

82. Plaintiffs are informed and believe that Experian sent Plaintiffs' disputes to BOA, as the data furnisher, via an ACDV through e-OSCAR on or about December 13, 2023.

83. Plaintiffs are informed and believe that Equifax has also sent additional disputes to BOA, as the data furnisher, via an ACDV through e-OSCAR, on at least one occasion since December 2023.

   a. **Inaccuracy – BOA**

84. Despite actual knowledge, BOA continued to report Mr. McIntosh's account, beginning in 592xxxxxxxxxx, to Experian with a payment status of "Discharged through Bankruptcy Chapter 13/Never late", and with incomplete and inaccurate payment history.

85. Despite actual knowledge, BOA continued to report Mrs. McIntosh's account, beginning in 592xxxxxxxxxx, to Experian with a payment status of "Discharged through Bankruptcy Chapter 13/Never late", and with incomplete and inaccurate payment history.

86. Despite actual knowledge, BOA continued to report Mr. McIntosh's account, beginning in XXXXXXXXX9224, to Equifax with a payment status of "INCLUDED_IN_CHAPTER_13", with a comment of "Bankruptcy chapter 13", and with incomplete and inaccurate payment history.

87. Despite actual knowledge, BOA continued to report Mrs. McIntosh's account, beginning in XXXXXXXXX9224, to Equifax with a payment status of

"INCLUDED_IN_CHAPTER_13", with a comment of "Bankruptcy chapter 13", and with incomplete and inaccurate payment history.

88. BOA's reporting is patently incorrect and misleading as Plaintiffs' bankruptcy has concluded, the debt was not discharged, and the Plaintiffs have continued to make payments until present.

89. Plaintiffs allege that BOA did not investigate whether the account was provided for in the plan and exempt from discharge.

90. On multiple occasion Equifax and Experian provided notice to BOA that the Plaintiffs were disputing the inaccurate and misleading information, and thus on multiple occasions BOA failed to conduct a reasonable investigation of the information as required by the FCRA.

91. Plaintiffs allege that the payment status of "INCLUDED_IN_CHAPTER_13" and "Discharged through Bankruptcy Chapter 13/Never late" are interpreted by lenders to mean the debt was discharged in bankruptcy. This is patently incorrect as the BOA account was not discharged in bankruptcy.

92. Plaintiff alleges that BOA reported the account with a CII of "H" which directs the CRA to report the debt as discharged in chapter 13 bankruptcy.

93. By continuing to report the BOA account as included in or discharged in bankruptcy even after the bankruptcy has concluded, it appears as if the debt was discharged. When coupling this with the incomplete payment history, creditors viewing these tradelines from Experian and/or Equifax would be misled to believe the debt was discharged.

94. Reporting an account that was excepted from discharge and is current, in a manner which appears as if it were discharged in bankruptcy is patently inaccurate. Reporting an inaccurate payment history is patently inaccurate. Further, reporting the Plaintiffs' account with a payment status of "INCLUDED_IN_CHAPTER_13" and "Discharged through Bankruptcy Chapter 13/Never late" is patently inaccurate as Plaintiffs' account was maintained through the Plaintiffs' bankruptcy plan, which has since ended. In addition, these inaccurate and incomplete tradelines are misleading in a way that can adversely affect credit decisions.

95. The most basic investigation would include a simple review of the fact Plaintiffs filed a Chapter 13 and that secured debts provided for in the plan are not discharged in Chapter 13

bankruptcies compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

96. BOA should have updated the reporting to show as current with an outstanding balance, removed the bankruptcy notation, and should have reported the payment history.

97. BOA should have updated the account reflect a CII of "Q" instead of "D" or "H".

98. By continuing to report Plaintiffs' account to as described hereinabove, it incorrectly appears to third parties viewing Plaintiffs' credit reports that they stopped paying the account, have not made payments in years, and that the account was discharged in their bankruptcy.

99. As this inaccurate reporting is being used to calculate Plaintiffs' Credit Scores, the credit scores alone being what most lenders use to determine a Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

100. As payment history makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment history reported by BOA is lowering each Plaintiff's respective Credit Scores, which adversely affects their ability to obtain credit.

101. A discharged debt is treated far more derogatorily by a potential lender than one which was excepted from discharge, current, and reflects a consumer's ability to make payments month after month, year after year.

102. Further, even if a lender did look through the tradelines, based upon BOA's reporting, it appears as if the Plaintiffs have not made any payments on the account and that it was discharged in their bankruptcy; both of which are inaccurate.

103. The lack of investigation and reporting of inaccurate and incomplete information by BOA is unreasonable.

**F.     Damages**

104. Plaintiffs pulled credit reports at issue at a cost for access to the reports, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

105. As a result of the incorrect reporting, Plaintiffs have also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Fair Credit Reporting Act and the power of this Court to preserve and perpetuate Plaintiffs' rights to accurate credit reporting as intended by Congress.

106. Plaintiffs have been denied credit, offered credit at higher than normal interest rates, and are unable to rebuild their credit based on the inaccurate reporting by BOA. Further, Plaintiffs' diminished creditworthiness, resulting from BOA's inaccurate reporting, have caused them to abandon their intentions to apply for certain credit.

107. BOA's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

## FIRST CAUSE OF ACTION
## (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
## (Against Defendant BOA)

108. Plaintiffs re-allege and incorporate the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  BOA Failed to Reinvestigate Following Plaintiffs' Disputes**

109. Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

110. BOA was required to conduct a separate reasonable investigation for each dispute it received.

111. Thus, on multiple occasions BOA violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

112. BOA knew the payment horizon extended beyond the term of the bankruptcy and that the payments were provided for in the Chapter 13 Plan. BOA knew Plaintiffs always paid this account on time.

113. Despite receiving payments, BOA would send an AUD to the CRAs reporting "D" for no data. This reporting is patently incorrect and misleading.

114. Reporting a paid as agreed account as if it were not paid but instead included and discharged in bankruptcy is patently incorrect and misleading.

115. Equifax and Experian each provided notice to BOA that the Plaintiffs were disputing the inaccurate and misleading information; however, BOA failed to conduct a reasonable investigation as required by the FCRA.

116. In response to one dispute in December of 2023, BOA reported to Experian on Mrs. McIntosh's report that the account was discharged in a Chapter 13 bankruptcy when it reported a CII of "D". Only a few days later, in response to a December 2023 dispute on Mr. McIntosh's report, BOA reported to Experian that the account was included in a Chapter 13 bankruptcy that was not yet discharged when it reported a CII of "H". Both responses are incorrect; however, this is an example of BOA's clear failure to conduct any investigation: it cannot even report consistently on the same account across the joint account holders.

117. Further, BOA failed to report any payment history on the account when it confirmed to Experian that "D" for no data was correct.

118. BOA reported a date of last payment for Mr. McIntosh as 12/27/2018 while reporting the date of last payment for Mrs. McIntosh as 2/28/2022. Both are patently incorrect; however, it again evidences BOA's completely unreasonable investigation.

119. Based on the Plaintiffs' disputes, along with a review of its own internal records, BOA should have known its account was paid on time as provided in the plan and was exempt from discharge. Further, BOA should have reported the full payment history as it has actual knowledge of Plaintiffs' payments each month.

120. As BOA has already decided to report the Plaintiffs' account, as evidenced by it showing up on their credit reports, once it received disputes on the account, it had a duty to review all relevant information, and update any incorrect or inaccurate information to each of the CRAs.

121. Inaccurate information includes not only the information reported, such as reporting an account that was paid as agreed as discharged, but also for omissions that render the reported information misleading, such as reporting "D" for "no payment history available" when an actual payment was made.

122. Reporting an account which is paid on time and current wholly without or with incomplete payment history is patently incorrect and misleading.

123. Reporting an account which was not discharged in bankruptcy as if it were discharged in bankruptcy is patently incorrect and misleading.

124. In addition, this inaccurate reporting also adversely affects credit decisions. Payment history, at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported Credit

Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, BOA's reporting as described herein has a direct adverse effect on each Plaintiff's Credit Score and their ability to rebuild each of their Credit Scores and obtain new credit.

125. The lack of investigation by BOA, as required by the FCRA, is unreasonable.

**B.  Willful Violations**

126. Plaintiffs allege that BOA has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

127. Plaintiffs further allege that BOA has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, has developed reckless policies and procedures.

128. Given all the documentation available to BOA regarding the treatment of the debt during bankruptcy, Plaintiffs' on-going payments, and the number of disputes it received, the only possible interpretation of BOA's continued inconsistent, inaccurate, and incomplete reporting is that it is the result of BOA's abject disregard to the reasonable investigation requirements of the FCRA. Therefore, BOA's failures are willful.

129. Plaintiffs allege that rather than train their employees on accurate credit reporting, FCRA requirements, and industry standards, BOA's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

130. In the alternative, BOA was negligent, which entitles the Plaintiffs each to recover under 15 U.S.C. § 1681o.

## PRAYER FOR RELIEF

131. WHEREFORE, Plaintiffs pray for judgment as follows:
    a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;
    b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;
    c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d.  Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e.  For determination by the Court that Defendants' policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq.*; and

f.  For determination by the Court that Defendants' policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: March 21, 2024

*/s/ Kyle Schumacher*
Kyle Schumacher
kyle@schumacherlane.com
P.O. Box 558
Spring Branch, TX 78070
503-482-8137 ph
210-783-1383 fax
Attorneys for Plaintiffs

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial of this matter by jury.

Dated: March 21, 2024

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorneys for Plaintiffs